**IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF WEST VIRGINIA**

IN THE MATTER OF THE SEARCH OF A
2013 FORD FUSION WITH WEST
VIRGINIA REGISTRATION D2N710 AND
VEHICLE IDENTIFICATION NUMBER
3FA6P0G7XDR127200

Case No. 2-23-mj-00078

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Rudy Basaldua, being first duly sworn, hereby depose and
state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a
search warrant to search a 2013 Ford Fusion, bearing West Virginia
license plate D2N710 (hereafter "TARGET VEHICLE"), used by ANDRE
CORDELL (hereafter "CORDELL") and NICHOLAS BURT (hereafter
"BURT"). The TARGET VEHICLE is registered to Jerry Means at 62
Wayson Drive, Nitro, West Virginia 25143. The TARGET VEHICLE is
described herein and in Attachment A, and the items to be seized
are described herein and in Attachment B.

2. I am a Special Agent (hereafter "SA") of the Drug
Enforcement Administration and as such I am an investigative or
law enforcement officer of the United States, within the meaning
of Section 2510(7) of Title 18, United States Code, and am
empowered by law to conduct investigations of and to make arrests

1

for offenses enumerated in Section 2516 of Title 18, United States Code. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of Fed. R. Crim. P. 41(a)(2)(C).

3. I have been employed by the Drug Enforcement Administration (DEA) since May 2020. I am currently assigned to the Charleston District Office (CDO), Charleston, West Virginia, High Intensity Drug Trafficking Area (HIDTA) Task Force, investigating narcotics trafficking, and other violations of U.S. Title 21. During the course of my DEA career, I have attended and completed training in the field of narcotics enforcement. This training included the DEA Academy in Quantico, Virginia. I have received training in the area of narcotics and dangerous drugs, such as usage and their effects, identification of illicit drugs, packaging and distribution techniques. I have received specialized instruction in the use of informants, informant information, making controlled purchases, and the use of surveillance equipment and techniques. I have received specialized training in the area of concealed transport and transfer of bulk cash and narcotics. I have received specialized training in interviews and debriefings of persons who have been involved with the use or sale of drugs. During my time as a Special Agent with the DEA, I have served as a case agent and investigator.

4. Prior to being a DEA Special Agent, I was a sworn law

enforcement officer in the State of Tennessee from 2016-2020.   In that capacity, I investigated violations of Tennessee State Laws, including drug offenses in violation of the Tennessee Code Annotated.  As a result, I have become familiar with methods of operation of drug traffickers and organizations.

5. As a Special Agent with the DEA, I work with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the distribution of fentanyl, heroin, cocaine, methamphetamine, marijuana, and other dangerous drugs. I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.  I have discussed and learned from other law enforcement investigators in regards to these matters as well.

6. Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, their use of vehicles to facilitate their drug trafficking activity, and the methods used to conceal, transport and distribute the controlled substances.

7. Through my assistance in a federal Title III investigation,

I gained experience in the interception of wire and electronic communications. I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance. Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers about drug traffickers and their use of cell phones to facilitate drug trafficking. I have also received extensive instruction and practical training on intercepting communications and conducting coordinated surveillance while at the DEA Academy.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I have not included every fact concerning this investigation. This affidavit is intended to show that there is a sufficient factual basis to establish probable cause to support the Application.

### PROBABLE CAUSE

9. On January 17, 2023, the Honorable Chief United States District Court Judge Thomas E. Johnston, in the Southern District of West Virginia, entered an order authorizing the interception of electronic and wire communications over cellular telephone (304)989-4455 (hereafter "TARGET TELEPHONE #1" or "TT1") used by TOBY LEE GRALEY (hereafter "GRALEY"). Intercepted communications

4

from TT1 established that TEVON O'SHEA VANHORN (hereafter "VANHORN") is a drug trafficker who is a source of supply for GRALEY in the distribution of large quantities of methamphetamine and fentanyl/heroin in and around Kanawha County, West Virginia, and within the Southern District of West Virginia.[1]

10. On January 18, 2023, investigators with the Drug Enforcement Administration – Charleston District Office began the interception of wire and electronic communications from TT1. That same date, investigators conducted physical surveillance in the area of GRALEY's residence at 29 Lumari Lane, Charleston, West Virginia. At approximately 10:27 p.m. on this same date (session 9787), GRALEY utilized TT1 to call VANHORN utilizing (304)610-0128 (hereafter "TARGET TELEPHONE #2" or "TT2"). The following was discussed:

> VANHORN: "Hello?"
> GRALEY: "What are you doing?"
> VANHORN: "Nothing much, how you doing?"
> GRALEY: "I'm hanging in."
> VANHORN: "I've got something better for you too."
> GRALEY: "Yeah…" (unintelligible background noise) "I need some of the other."
> VANHORN: "The fast or the slow?"
> GRALEY: "The slow."
> VANHORN: "Slow?"
> GRALEY: "No the fast, no the fast."
> VANHORN: "Can you handle some slow?"
> GRALEY: (unintelligible background noise.)
> VANHORN: "I've got something that's really strong and it's white."
> GRALEY: (unintelligible background noise.) "Uh I

---

[1] The authorization for intercepting TT1 expired on February 16, 2023.

| | |
|---|---|
| | *don't know uh."* |
| VANHORN: | *"Or can you handle the same thing I sent...I gave you last time?"* |
| GRALEY: | *"Of the slow?"* |
| VANHORN: | *"Yeah. Its its all white, it's white how you like it and it's way stronger."* |
| GRALEY: | *"Yeah? Well I really need a couple more days to"* (unintelligible) *"that much money up."* |
| VANHORN: | *"Oh okay umm...do you want me to, I mean what do you want to do."* |
| GRALEY: | *"I just want a pound of stuff."* |
| VANHORN: | *"Okay...I'll bring it by."* |
| GRALEY: | *"Okay..."* (unintelligible) |
| VANHORN: | *"Huh?"* |
| GRALEY: | *"You coming this evening?"* |
| VANHORN: | *"Yeah."* |
| GRALEY: | *"Okay."* |
| VANHORN: | *"Alright bub."* |
| GRALEY: | *"Be waiting, alright bye"* |
| | *[End of Call]* |

Based on my training, experience, and knowledge of this case, I know that "fast" and "go" are common slang terms for methamphetamine. I also know that "slow" is a common slang term for fentanyl/ heroin. Based on controlled buys conducted on GRALEY, I know that GRALEY has distributed methamphetamine and fentanyl. Based on this call, I believe that when VANHORN asked GRALEY, "Can you handle some slow", VANHORN was asking GRALEY if he wanted any fentanyl/heroin. I also believe that when VANHORN stated, "I've got something that's really strong and it's white" and "Yeah. It's, it's all white, it's white how you like it and it's way stronger", VANHORN was letting GRALEY know that his fentanyl/heroin was white in color and that it was very strong or potent. I further believe that when GRALEY replied, "Yeah? Well I really need a couple more

6

days to (unintelligible) that much money up", GRALEY was informing VANHORN that he would have to get money together and might have it in a couple more days. When VANHORN then asked GRALEY, "Oh okay umm… do you want me to, I mean what do you want to do?", I believe VANHORN was asking GRALEY what he was wanting to buy. When GRALEY replied, "I just want a pound of stuff" and VANHORN replied, "Okay… I'll bring it by.", I believe that VANHORN would be stopping by GRALEY's residence to deliver to GRALEY a pound of "stuff", i.e. a pound of drugs, which GRALEY had requested.

11.  Based on this call, investigators continued surveillance into the morning of January 19, 2023. At approximately 12:20 a.m., DEA SA Benjamin Henrich observed a white car arrive at GRALEY's residence. At approximately 12:45 a.m., SA Basaldua then observed via electronic surveillance that a vehicle was pulling out of GRALEY's residence as indicated by its headlights. At approximately the same time, SA Henrich then reported that the vehicle was white in color, possibly with older style headlights and possibly a 2-door vehicle. DEA Task Force Officer ("TFO") Terry McFann and DEA Group Supervisor ("GS") Lance Lehnhoff (hereafter "Lehnhoff") intercepted the vehicle and followed the vehicle to the intersection of Jefferson Road and Kanawha Turnpike in Charleston, West Virginia, where GS Lehnhoff observed that the

vehicle was bearing West Virginia license plate: D2N710[2]. TFO McFann, GS Lehnhoff, and GS Brian Roscoe (hereafter "Roscoe") maintained surveillance on the vehicle as it traveled north on Jefferson Road, then east on Route 60. Surveillance was maintained as the vehicle traveled onto Interstate 64 westbound and Exit 50 (Institute). GS Lehnhoff and GS Roscoe maintained surveillance on the vehicle and observed the right turn signal activate as if the driver intended to turn onto Goff Mountain Road. However, as the vehicle approached the turn, the driver made an abrupt left turn, opposite of Goff Mountain Road. Based on my training and experience, I know that this maneuver is a common counter surveillance technique. After this maneuver, surveillance of the TARGET VEHICLE was ended so as not to alert the vehicle.

12.   On January 19, 2023, at approximately 7:59 p.m. (session 10202), GRALEY utilized TT1 to receive a call from VANHORN utilizing TT2. The following was discussed:

| | |
|---|---|
| VANHORN: | "Oh yeah… yeah, yeah, yeah, Ima come see you in prolly like an hour is cool?" |
| GRALEY: | "Huh?" (inaudible background noise) |
| VANHORN: | "In an hour?" |
| GRALEY: | (Inaudible) |
| VANHORN: | "You hear me? |
| GRALEY: | "Yeah, I hear you." |
| VANHORN: | "Alright see you soon." |
| GRALEY: | "Alright." |
| VANHORN: | "Alright." |

---

[2] West Virginia License Plate D2N710 is registered on a 2013 Ford Fusion registered to Jerry Means at 62 Wayson Drive, Nitro, West Virginia, with a vehicle registration expiration date of 12-01-2023.

Based on this call, I believed that the caller from TT2 would be stopping by GRALEY's residence. Therefore, surveillance was again on the lookout for the TARGET VEHICLE.

13.   At approximately 9:38 p.m. (session 10209), GRALEY utilized TT1 to place a call VANHORN utilizing TT2, and when it was not answered, he left a voicemail:

> GRALEY:   *"Hey Von, uh… we may have to wait on that, cause I gotta get going."*
>
> *[End of voicemail message]*

Based on this call, I believe that GRALEY referenced the earlier phone conversation between himself and VANHORN and referred to the caller from TT2 as "Von", which would be an abbreviation of "TEVON."

14.   On March 8, 2023, the Honorable Chief United States District Court Judge Thomas E. Johnston, in the Southern District of West Virginia, entered an order authorizing the interception of wire communication for (304)989-4455 (TT1) utilized by GRALEY and (304)610-0128 (TT2) utilized by VANHORN. On that same date, investigators began the interception of wire and electronic communications.

15.   On March 10, 2023, investigators conducted a post-arrest debrief of DREMA KAY KEENEY (hereafter "KEENEY") during which KEENEY stated that "Mary" TOWNSEND (hereafter "TOWNSEND") is paid by VANHORN to allow him to sell out of TOWNSEND's residence located

at 40 Wayson Drive, Nitro, West Virginia 25143. Furthermore, investigators conducted an open source search of the address located at 40 Wayson Drive which established that TOWNSEND is associated with that address. Investigators also searched the peer to peer payment application CashApp using the phone number investigators believe is associated with TOWNSEND. Investigators located an account with the username $queenkrazzie as well as a photograph of TOWNSEND. On March 28, 2023, investigators executed a federal search warrant for the residence of 40 Wayson Drive, Nitro, West Virginia, and inside that residence investigators found a collage piece of art displaying a photograph of TOWNSEND with the inscription "queen krazzie". Investigators believe that the user of (304)533-3488 is Mary TOWNSEND.

16.   On March 26, 2023, at approximately 5:49 p.m. (session 14155), TOWNSEND utilized (304)533-3488 to call GRALEY utilizing TT1. The following was discussed:

> GRALEY:    "Hello."
> TOWNSEND:  "Hey, Toby."
> GRALEY:    "Hey."
> TOWNSEND:  "Hey."
> GRALEY:    "Hey."
> TOWNSEND:  "Hey, I just got done talking to him and, uh, he said he's fixin' to call you off his new number. And he's fixin' to get stuff ready but he's gonna get ready to call you off his new number."
> GRALEY:    "Alright."
> TOWNSEND:  "Alright?"
> GRALEY:    "Alright."
> TOWNSEND:  "Alright, I'll see ya shortly."
> GRALEY:    "Alright."

TOWNSEND: "Bye."

Based on my training, experience, and knowledge of this case, I believe when TOWNSEND stated "Hey, I just got done talking to him and, uh, he said he's fixin' to call you off his new number. And he's fixin' to get stuff ready but he's gonna get ready to call you off his new number," I believe TOWNSEND was advising GRALEY she had talked to VANHORN that VANHORN had advised her to tell GRALEY he's getting his narcotics ready, and that VANHORN would call GRALEY off of his new number. Investigators also believe that TOWNSEND is a distributor/stash house operator for VANHORN based on the abovementioned intercepted communications. I believe that VANHORN was obtaining a new phone number because he was suspicious of being caught by law enforcement due to the aforementioned takedown in and around Charleston, West Virginia.

17.    On March 26, 2023, at approximately 8:12 p.m. (session 14180), a then unknown male (subsequently identified as VANHORN) utilized (681)990-4255 to call GRALEY utilizing TT1. The following was discussed:

> VANHORN:  "Hello."
> GRALEY:   "Hello."
> VANHORN:  "What's up Bubby."
> GRALEY:   "Oh, not much, what you doin?"
> VANHORN:  "Not much, relaxing, how you feeling?"
> GRALEY:   "I'm alright."
> VANHORN:  "Alright, Ima uh, it'll be on its way shortly."
> GRALEY:   "Well, okay."
> VANHORN:  "Okay."

11

```
GRALEY:    "I'm not home right now anyway."
VANHORN:   "How long is gon' be 'till you home?"
GRALEY:    "Uhm, prob'bly an hour."
VANHORN:   "Huh?"
GRALEY:    "Prob'bly an hour."
VANHORN:   "Okay, I'll see you there."
GRALEY:    "Okay bud."
VANHORN:   "Alright."
```

Based on my training, experience, and knowledge of this case, when VANHORN stated "Alright, Ima uh, it'll be on its way shortly," I believe VANHORN was advising GRALEY the narcotics would be on their way to GRALEY's house shortly. When GRALEY replied "Well, okay." I believe GRALEY was acknowledging VANHORN and was agreeing with VANHORN. When VANHORN stated "How long is gon' be 'till you home?" I believe he was asking when GRALEY was going to be home so that VANHORN can bring him the narcotics. When GRALEY replied "Uhm, prob'bly an hour." I believe GRALEY was advising VANHORN he would be home in an hour. When VANHORN replied, "Okay, I'll see you there," I believe VANHORN was reaffirming GRALEY that he would see him at his residence to deliver the narcotics.

18.  At approximately 11:21 p.m., investigators observed via electronic surveillance a pickup truck with a bed cover and a white sedan behind it leaving the area of 40 Wayson Drive, Nitro, West Virginia. At approximately 11:46 p.m., investigators observed via electronic surveillance two vehicles matching the same description arrive at GRALEY's residence.

19.  That same date, at approximately 11:56 p.m. (session

14213), VANHORN utilized (681)990-4255 to text GRALEY utilizing TT1. The text message stated the following:

> VANHORN: *"This this your good friend I'm waiting on you."*

Based on the above text message, I believe VANHORN advised GRALEY he was waiting on him at his residence.

20.  On the following morning of March 27, 2023, at approximately 12:08a.m. (session 14222), VANHORN utilized (681)990-4255 to call GRALEY utilizing TT1, and there was no answer. At approximately 12:11 a.m. (session 14227), an unknown individual utilized (304)563-3613 to send GRALEY a text message utilizing TT1. The text message stated the following:

> *(304)563-3613: "Hey call me back because oh boy is here with that."*

Based on training, experience, and knowledge of this case, I believe when the unknown individual stated, "Hey call me back because oh boy is here," I believe that the individual was referring to VANHORN. Based on previous intercepted communications with TT2, surveillance, and knowledge of this case, I believe VANHORN was the male utilizing (681)990-4255.

21.  On March 27, 2023, at approximately 4:37 p.m., SA Brandon Harris (hereafter "Harris") was conducting physical surveillance on the residence located at 711 Main Avenue, Nitro, West Virginia, when SA Harris observed the TARGET VEHICLE pull

into and park in the driveway. SA Harris observed an unknown black male wearing a black shirt and dark pants exit the driver's seat of the vehicle. SA Harris also observed an unknown black male wearing a red shirt and a dark baseball style hat exit the front passenger seat of the vehicle. Both black male subjects entered the residence at 711 Main Avenue, Nitro, West Virginia, via the front door. The TARGET VEHICLE bears West Virginia registration plate D2N710 and is registered to Jerry MEANS of 62 Wayson Drive, Nitro, West Virginia 25143. Investigators have observed the TARGET VEHICLE at the residence located at 711 Main Avenue, Nitro, West Virginia, on previous occasions including March 9, 2023, and March 10, 2023.

22.   At approximately 4:41 p.m., SA Harris observed the aforementioned black male wearing the black shirt and dark pants exit the residence at 711 Main Avenue, Nitro, West Virginia, and return to the TARGET VEHICLE. The unknown black male entered the driver's seat and departed.

23.   At approximately 5:29 p.m., SA Harris located the aforementioned TARGET VEHICLE parked on 2nd Avenue near the intersection of Florida Street in Charleston, West Virginia. Investigators believe that a woman identified as Nicole CONAWAY (hereafter "CONAWAY") is the girlfriend of VANHORN's brother, Derrick VANHORN-SMITH. Investigators believe CONAWAY resides at 1310 2nd Avenue, Apt. D, Charleston, West Virginia, due to

information obtained through a June 10, 2022, Charleston Police Department report in which CONAWAY told officers that she lived at 1310 2nd Ave. Apt D, Charleston, West Virginia 25302. SA Harris also has observed a maroon Kia Sorento bearing West Virginia registration plate 97S656 parked on 2nd Avenue near the aforementioned address on March 26, 2023. Investigators observed the same Kia Sorento leaving 40 Wayson Drive, Nitro, West Virginia, on March 1, 2023, and March 9, 2023, and 711 Main Avenue, Nitro, West Virginia, on March 10, 2023.

24. On this same date at approximately 6:12 p.m. (session 14321), TOWNSEND utilized (304)563-3613 to call GRALEY utilizing TT1, though initially TT1 was utilized by an unknown male (hereafter "UM"). The following was discussed:

UM: "Hello."
TOWNSEND: "Hey, where is Toby?"
UM: "Asleep."
TOWNSEND: "Well, I need to talk to him."
UM: "So, you want me to wake him up?"
TOWNSEND: "It's important."
UM: "Yeah, he told me he was supposed to call somebody here in just a minute and then he [STAMMERS] fell back to sleep."
TOWNSEND: "Well, can you take him the phone please 'cause I need to talk to him.
UM: "Yeah, he's sittin' here snoring, God, I hate waking him up."
TOWNSEND: "Well, I need to talk to him."
UM: "Alright. Okay."
UM: [Aside to GRALEY: TOBY you gotta take this call buddy... hey man... I hate to wake you up [Chuckles]... hey TOBY]
UM: "He's snoring."
TOWNSEND: "Tell 'im it's me- tell 'im me and it's important."

15

UM:           [Aside to GRALEY: It's important [U/I] I
              answered it for you man, it's been ringing
              for the past hour, will you talk to her real
              quick?]
UM:           "Hey, he don't wanna talk to nobody."
TOWNSEND:     "It's very important that I talk to him,
              tell him."
UM:           [Aside to GRALEY:   It's very important she
              says.]
GRALEY:       "Mmm. Yeah?"
TOWNSEND:     "Hey. Hey, uh, Old-Dude just got done
              calling me and told me to tell you that uh,
              he's sending 400, is that okay?"
GRALEY:       "Mmm."
TOWNSEND:     "Huh?"
GRALEY:       "What dude?"
TOWNSEND:     "Huh?"
GRALEY:       "What dude?"
TOWNSEND:     "Von."
GRALEY:       "Ughh. He's doing what?"
TOWNSEND:     "He's gonna send you a 400. So, I don't
              know, all I know is he told me to tell you
              that."
GRALEY:       "Uhm."
TOWNSEND:     "And he told me to ask you; "Is that
              alright?""
GRALEY:       "I don't know [U/I] what's he talking
              about."
TOWNSEND:     "I don't either, that's all I know- that's
              all I- he just told me to tell you th- he's
              gonna send 400 and "Was that okay?"
TOWNSEND:     [Aside: [U/I] today?]
GRALEY:       "Uhm."
TOWNSEND:     "I'll call him back and ask him what he's
              talking about and then I'll call you back, I
              guess. Alright?"
GRALEY:       "Alright."

Based on my training, experience, and knowledge of this case, I
believe that TOWNSEND and GRALEY were discussing a drug transaction
that would be taking place on that day. Agents with the DEA
Charleston District Office and other law enforcement partners then
established surveillance in the area of 40 Wayson Drive, Nitro,

West Virginia, and in the area of 29 Lumari Lane, Charleston, West Virginia, namely GRALEY's residence near the Kanawha State Forest. Investigators were conducting surveillance in an attempt to locate known vehicles that were often driven by members of the VANHORN Drug Trafficking Organization (DTO) as investigators believed approximately 400 grams of suspected drugs would be delivered to GRALEY's residence per the previously mentioned intercepted communications.

25. On this same date at approximately 7:08 p.m. (session 14330), GRALEY utilized TT1 to call VANHORN utilizing (681)990-4255 after an unknown female put GRALEY on the phone. The following was discussed:

| | |
|---|---|
| UF: | "Fifteen (15)? Alright, yup, that's exactly, yeah. [Pause]" |
| VANHORN: | "Hello. Hello? Hello?" |
| UF: | "Yo." |
| VANHORN: | "What up though?, Where you- who the hell is saying    that?" |
| UF: | "Yo, I'm here, here, I'm gonna let you so you can talk to him, okay?" |
| VANHORN: | "Yeah." |
| UF: | "Alright." |
| UF: | [Aside to GRALEY:   Here.] |
| GRALEY: | "Hey." |
| VANHORN: | "Hey bubby how you doing?" |
| GRALEY: | "Uh... I'm alright [U/I]." [VOICES OVERLAP] |
| VANHORN: | "You good?" |
| GRALEY: | "Hm." |
| VANHORN: | "Ima uh, have my brother come over there, can you handle four-hundred (400)?" |
| GRALEY: | "Uh, I don't know." |
| VANHORN: | "Well, listen, Ima have him bring four-hundred (400) and just, whatever the |

17

difference is I'll just catch up to you on a
different day."

GRALEY:      "Uhm."
VANHORN:     "You hear me?"
GRALEY:      "Yeah I wasn't... what is the ticket on it?"
VANHORN:     "You said- you say what?"
GRALEY:      "What is the ticket on it?"
VANHORN:     "You say what?"
GRALEY:      "What is the ticket?"
VANHORN:     "Uh, fifty (50) a gram.  Do you want five-
hundred (500)? That only be like, shit,
like, you won't be able to just.    [ASIDE:
[U/I]]"
GRALEY:      "Uh."
VANHORN:     "Hello?"
GRALEY:      "Yeah, I'm here."
VANHORN:     "Yeah, Ima 'bout to tell you the ticket on
it. Hold on."
VANHORN:     "Hold on. [Background UF: I ain't even know
what it was so of course...]."
VANHORN:     "Hey, I'll do uh, five hundred (500) for
twenty-five (25)."
VANHORN:     "[Background UF:    I'm still massaging
[U/I] an hour [U/I] down there.]"
GRALEY:      "Umm. Well."
VANHORN:     "You heard me?"
GRALEY:      "Yeah, [U/I]."
VANHORN:     "It's about to be on its way."
GRALEY:      "Well."
VANHORN:     "I'm about to call- I'm gonna have a lil- my
little brother come over there, I'm about to
have him bring it to you."
VANHORN:     "[Background UF:    Alright, I'm almost
there [U/I] forty (40) minutes now.]"
GRALEY:      "And the four-hundred (400) is that much?"
VANHORN:     "For four-hundred (400) is... four-hundred
(400) is twenty (20)."
GRALEY:      "Oh, ugh."
VANHORN:     "I'm about to tell him to be on his way up."
GRALEY:      "Alright. Why don't you just send me fifteen
(15)?"
VANHORN:     "Say what?"
GRALEY:      "Why don't you just send me fifteen (15)?"
VANHORN:     "Whatchu mean?"
VANHORN:     "[Aside: Tell O- tell him to come here pick
'em [U/I]s.]"
GRALEY:      "No."

18

```
VANHORN:    "[Aside: Wait]."
GRALEY:     "I only got about fifteen grand (15,000)."
VANHORN:    "Alright, well, look, Ima have him bring you
            the four hundred (400), just, give me the
            other five (5) next week sometime."
GRALEY:     "Okay."
VANHORN:    "Alright pops."
GRALEY:     "Alright buddy."
```

Based on my training, experience, and knowledge of this case, I believe that when VANHORN asked GRALEY "Can you handle four hundred (400)," VANHORN was asking GRALEY if he could handle buying four hundred grams of drugs. I believe when VANHORN told GRALEY that he was going to have his "brother [...] bring 400 and just, whatever the difference is I'll just catch up to you on a different day," I believe VANHORN was telling GRALEY that VANHORN would have another individual stop by GRALEY's residence to sell him the drugs and that GRALEY could pay back any money he owed later if he did not have enough to pay for the 400 grams. I believe when GRALEY asked VANHORN "what is the ticket on it," GRALEY was asking VANHORN how much the price of the drugs would be. When VANHORN stated "Hey, I'll do uh five hundred (500) for twenty-five (25)," I believe VANHORN was telling GRALEY that 500 grams of drugs would cost $25,000. When VANHORN advised GRALEY that it is "fifty (50) a gram", I believe this indicated VANHORN's price of drugs, which was $50 per gram. Due to my training and experience, heroin/fentanyl in this geographic region is approximately $75 to $100 per gram. Thus, $50 per gram multiplied by 400 grams of dope

19

is $20,000. Given the aforementioned intercepted communication, I believe VANHORN and GRALEY were discussing the purchase of heroin and/or fentanyl.

26.   At approximately 7:51 p.m., SA Anthony Brumfield (hereafter "Brumfield") was monitoring the electronic surveillance equipment and observed what appeared to be the TARGET VEHICLE arrive at 40 Wayson Drive, Nitro, West Virginia. Upon arrival, SA Brumfield observed an unknown male wearing what appeared to be a black sweatshirt and black pants, exit the passenger side of the vehicle. SA Brumfield also observed an unknown male wearing what appeared to be a red jacket, black hat, and black pants exit the driver's side of the vehicle. SA Brumfield observed both unknown male subjects walk to the rear area of 40 Wayson Drive, Nitro, West Virginia.

27.   At approximately 8:05 p.m., SA Brumfield was monitoring the electronic surveillance equipment and advised an unknown subject walked from the rear of 40 Wayson Drive and entered the driver's seat of what appeared to be the TARGET VEHICLE. The unknown subject then returned to the rear of 40 Wayson Drive, Nitro, West Virginia.

28.   At approximately 9:02 p.m., SA Brumfield observed two unknown subjects walk from the area of 40 Wayson Drive, Nitro, West Virginia, and enter what appeared to be the TARGET VEHICLE.

At approximately 9:04 p.m., the TARGET VEHICLE departed the area of 40 Wayson Drive, Nitro, West Virginia.

29. At approximately 9:07 p.m., TFO Jon Vernon (hereafter "Vernon") observed the TARGET VEHICLE at the intersection of Cross Lanes Drive and Goff Mountain Road. TFO Vernon and GS Brian Roscoe maintained visual surveillance on the TARGET VEHICLE as it traveled onto Interstate 64 eastbound. TFO Vernon and GS Roscoe terminated their visual surveillance once the TARGET VEHICLE exited at the Montrose Drive exit.

30. At approximately 9:25 p.m., SA Harris observed the TARGET VEHICLE travel past his location on Oakhurst Drive at Kanawha State Forest Drive followed by a West Virginia State Police cruiser.

31. At approximately 9:28 p.m., Senior West Virginia State Police Trooper (hereafter "Senior Trooper") Tristan Fields (hereafter "Fields") conducted a traffic stop on the TARGET VEHICLE bearing West Virginia registration plate D2N710. Senior Trooper Fields was performing patrol in the area along Oakhurst Drive in Kanawha County, West Virginia, when he observed the TARGET VEHICLE. Senior Trooper Fields observed the vehicle with a defective registration light as well as illegal window tint. Senior Trooper Fields initiated a traffic stop at this time. Senior Trooper Fields approached the vehicle and made contact with the driver identified as CORDELL and the front passenger identified as BURT. Senior

21

Trooper Fields asked CORDELL for his operator's license and vehicle information at which time CORDELL was able to produce an operator's license but was unable to locate the other vehicle information at the time. Senior Trooper Fields observed CORDELL to be extremely nervous with visible hand tremors and shallow breathing. Senior Trooper Fields then inquired if the car belonged to CORDELL at which time CORDELL advised it did not.

32.   Senior Trooper Fields asked both occupants to exit the vehicle at which time they did. Senior Trooper Fields asked CORDELL where he was going and CORDELL advised the gas station. Senior Trooper Fields also asked CORDELL where he was coming from, and CORDELL advised a friend's house. CORDELL could not tell Senior Trooper Fields the location of the friend's house. Senior Trooper Fields then asked CORDELL for verbal consent to search the vehicle at which time he denied consent to do so.

33.   Senior Trooper Fields then deployed K9 Csabi at the scene of the traffic stop and at which time the K9 conducted a free air sniff of the vehicle. The K9 gave a positive indication to the presence of imprinted odors. Senior Trooper Fields then conducted a probable cause search of the vehicle and located a clear plastic zip lock bag containing two (2) clear plastic bags possessing a distributional amount of a white powdery substance believed to be suspected fentanyl weighing approximately 435 grams under the passenger seat where Mr. Burt was seated. The suspected drugs where

then seized. After discovering the suspected drugs, Senior Trooper Fields observed BURT to be sweating heavily. Both occupants were then placed under arrest.

34.   At the West Virginia State Police Charleston Detachment, I read CORDELL and BURT their advice of rights during a recorded interview, and both declined to speak to investigators. DEA Investigators seized the white powder, the cell phones of both CORDELL and BURT, and the TARGET VEHICLE. According to Trooper Fields, a detailed search of the vehicle was stopped after Troopers located the quantity of white powder believed to be fentanyl. At the DEA Charleston District Office, the white powder field-tested posted for fentanyl. The TARGET VEHICLE is currently located at the DEA Charleston District Office at 2 Union Square Ste 300, Charleston, West Virginia 25302.

## Conclusion

36.   Based on the facts of this case mentioned in this affidavit, probable cause exists that VANHORN, CORDELL, BURT, and GRALEY have been engaged in drug trafficking activities in violation of (i) the distribution and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); and (ii) conspiracy to commit and attempts to commit these offenses, in violation of 21 U.S.C. § 846. Probable cause exists that evidence of those offenses, fruits of those offenses,

and property designed for use, intended for use, or used to commit those offenses are currently located in the TARGET VEHICLE as more fully described in Attachment A.

Further your affiant sayeth naught.

Rudy Basaldua
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me by telephone this 21st day of April, 2023.

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE